842 So.2d 590 (2003)
Rodney "Kipp" McLARTY, Appellant
v.
STATE of Mississippi, Appellee.
No. 2001-KA-01584-COA.
Court of Appeals of Mississippi.
April 8, 2003.
J. Stewart Parrish, Meridian, for appellant.
Office of the Attorney General by John R. Henry, for appellee.
Before MCMILLIN, C.J., THOMAS and CHANDLER, JJ.
*591 THOMAS, J., FOR THE COURT:
¶ 1. Rodney "Kipp" McLarty was found guilty of aggravated assault and sentenced to fifteen years in the custody of the Mississippi Department of Corrections, with seven years suspended and five years under post-release supervision. Aggrieved he asserts the following on appeal:
I. THE COURT ERRED IN DENYING THE REQUEST TO POLL THE JURY.
II. THE COURT ERRED IN AMENDING THE INDICTMENT FIVE DAYS PRIOR TO THE DATE OF TRIAL.
III. THE COURT ERRED IN GRANTING JURY INSTRUCTION NUMBER THREE ON AIDING AND ABETTING AND TAKEN AS A WHOLE THE INSTRUCTIONS FAILED TO PROPERLY SET FORTH THE ESSENTIAL ELEMENT OF AGGRAVATED ASSAULT, AIDING AND ABETTING.
IV. THE JURY WAS NOT PROPERLY INSTRUCTED ON WHAT CONSTITUTES A "DEADLY WEAPON" OR "OTHER MEANS LIKELY TO PRODUCE DEATH OR SERIOUS BODILY INJURY."
V. THE COURT ERRED IN ALLOWING TESTIMONY WITH NO RELEVANCE TO THE CHARGE.
VI. THE COURT ERRED IN NOT DIRECTING A VERDICT ON BEHALF OF THE DEFENDANT AND IN NOT GRANTING DEFENDANT'S MOTION FOR JNOV AS THE GUILTY VERDICT WAS NOT SUPPORTED BY THE EVIDENCE.
Finding reversible error in the trial judge's refusal to poll the jury and allowing the State to amend the indictment, we reverse and remand for a new trial.

FACTS
¶ 2. Rodney "Kipp" McLarty, along with three other defendants were indicted on February 15, 2000, for the aggravated assault upon Shawn McInnish on August 21, 1999.
¶ 3. On August 21, 1999, Shawn McInnish and Jason Lee Stuart, both from Tupelo, accompanied two other friends to a party at Craig Young's house in Saltillo, Mississippi. The group arrived at the party around ten p.m. Shortly after arriving at the soiree, the group was offered a beverage. When they declined, a number of individuals, including McLarty, began to inquire sarcastically and insultingly as to the refusal. McInnish and Stuart decided to appease the wants of the group and accept the offer. The jibes from McLarty and others continued when McInnish displayed his lack of experience with the workings of a beer tap. After drawing a glass of beer, McInnish stood by Stuart and Young while taking in the various party scenes of Young's backyard. Stuart received a phone call about thirty minutes after arriving at the party and began to talk to the caller. It was about the same time when McInnish noticed a group of "boys" approaching him. McInnish, bewildered as to what the backyard legion was all about, stood there as the group approached. McInnish remembered nothing more until he regained consciousness and found himself lying bloodied and in great pain. He noticed that Stuart had been injured as well. Shortly after the affray, an ambulance was summoned and as the medics strapped McInnish to the stretcher and wheeled him into the ambulance McLarty and others yelled at him. The group was warning McInnish that if he preferred charges against them for their deed they would kill him and his mother.
¶ 4. At trial numerous witnesses testified about the incident and the facts leading up *592 to the same. McLarty was described as soliciting individuals to take part in the beating of McInnish as well as leading the pack of "boys" in the attack. One witness testified that McLarty asked him to be sure that he "didn't get whipped." Another witness testified that she heard McLarty enlist the aid of two or three others with the intention of fighting. This same witness testified that she saw McLarty throw the first blow striking McInnish on the side of the head. Yet another witness testified that he too heard McLarty organize the attack and further stated that McInnish was taken by surprise by McLarty and his minions.
¶ 5. At trial the defense produced McLarty's former girlfriend to testify as to what she witnessed on the night of Young's party. She recalled that when McLarty and she arrived at the party, McLarty was approached by several boys and asked about his willingness to get into a fight, that he at first demurred but later expressed a desire to do so. The witness went beyond the acts witnessed and testified that the two individuals attacked should have expected to be attacked when they arrived that night as they were residents of Tupelo visiting Saltillo.
¶ 6. At trial, McInnish was allowed to testify about an incident which occurred two and a half years prior. The incident involved McLarty assaulting an unnamed girl and McInnish coming to her aid. The incident was offered as possible motive of the assault on him by McLarty.
¶ 7. McInnish suffered severe injuries as a result of the assault. The treating physician noted multiple abrasions about McInnish's eyes and forehead, and significant trauma to the lower part of his face. McInnish suffered a fractured jaw which required surgery and took about three months to heal throughout which time McInnish had to sustain himself on a liquid diet.

I. DID THE COURT ERR IN DENYING THE REQUEST TO POLL THE JURY?
¶ 8. After the verdict was read in open court the trial judge began to thank the jury and excuse them when McLarty's counsel asked that the jury be polled. This request was denied. The right to poll the jury is explicit in Rule 3.10 of the Uniform Rules of Circuit and County Court. Rule 3.10 specifically provides that after the verdict is read in open court in the presence of the jury, "[t]he court shall inquire if either party desires to poll the jury, or the court may on its own motion poll the jury." URCCC 3.10. See also State v. Taylor, 544 So.2d 1387, 1389 (Miss.1989). We have recognized that the purpose of polling a jury is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented. Although defendant's counsel was tardy in his request for a jury poll, the jury was still in the courtroom. The trial court's failure to poll the jury is reversible error.

II. DID THE COURT ERR IN AMENDING THE INDICTMENT FIVE DAYS PRIOR TO THE DATE OF TRIAL?
¶ 9. The State amended the indictment just five days prior to trial changing the wording of the indictment which originally was under § 97-3-7(2)(b) to fall under § 97-3-7(2)(a). The Mississippi Supreme Court has made it "clear that the *593 ultimate test, when considering the validity of an indictment on appeal, is whether the defendant was prejudiced in the preparation of his defense." Medina v. State, 688 So.2d 727, 730 (Miss.1996). The indictment must be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him. Peterson v. State, 671 So.2d 647, 653-54 (Miss.1996); URCCC 7.06. The indictment is held to be sufficient if it contains the seven factors enumerated in URCCC 7.06.
¶ 10. McLarty contends the indictment charging him with aggravated assault pursuant to Mississippi Code Annotated § 97-3-7(2)(b) was amended erroneously less than five days before trial. McLarty argues that the amended indictment changed the substance of the charge from aggravated assault under Miss.Code Ann. § 97-3-7(2)(b) to a charge under Miss.Code Ann. § 97-3-7(2)(a). McLarty further argues that neither the original indictment nor the amended indictment was sufficient to properly charge him with aggravated assault.
¶ 11. The test for determining whether a change to an indictment is one of form or one of substance is well established. Shelby v. State, 246 So.2d 543, 545 (Miss.1971). An amendment to an indictment goes to form rather than substance "if the change does not materially alter facts which are the essence of the offense on the face of the original indictment or if the change does not materially alter a defense to the original indictment so as to prejudice the defendant's case." Chandler v. State, 789 So.2d 109, 111(¶ 4) (Miss.Ct. App.2001). Any amendment not approved by the grand jury must be of form only and must not affect the substance of the charge pending. Rhymes v. State, 638 So.2d 1270, 1275 (Miss.1994).
¶ 12. The original indictment charged McLarty under Miss.Code Ann. § 97-3-7(2)(b). The amended indictment changed the substance of the indictment charging McLarty under Miss.Code Ann. § 97-3-7(2)(a). The original indictment charged McLarty and his cohorts with having
willfully, unlawfully, and feloniously commit[ted] an aggravated assault upon Shawn McInnish by attempting to cause and by causing, knowingly and purposely, serious bodily injury to McInnish, a human being, with numerous deadly weapons, to wit: padlocks, chains, brass knuckles, baseball bat, and steel toe boots, by hitting and kicking [the] victim with their fists, feet and other unknown weapons causing serious bodily injury, thereby manifesting extreme indifference to the value of human life.
Miss.Code Ann. § 97-3-7(2)(b).
We hold here that when the grand jury returned this indictment under sub-section (b), requiring purposeful and wilfull and knowing actions, that stated the charge upon which this defendant could be tried. When the proposed amendment was offered to allow the jury to convict under section (a) of the statute to include recklessly causing serious bodily injury under circumstances manifesting extreme indifference to the value of human life, this proposed a change of substance and not of form.
Quick v. State, 569 So.2d 1197, 1199-1200 (Miss.1990).
¶ 13. The amended indictment replaced the pluralized weapons with weapon and instead of listing the weapons, stated: with other means likely to produce death or serious bodily harm. The amended indictment had the effect of changing the substance of the indictment. The amended indictment collapse (a) and (b), and confuse the two separate subsections. With overlapping *594 terms of the statute in the amended indictment the indictment is rendered defective and unclear. Thus we reverse and remand for new trial.

VI. DID THE COURT ERR IN NOT DIRECTING A VERDICT ON BEHALF OF THE DEFENDANT AND IN NOT GRANTING DEFENDANT'S MOTION FOR JNOV AS THE GUILTY VERDICT WAS NOT SUPPORTED BY THE EVIDENCE?
¶ 14. McLarty argues that the trial court should have granted his directed verdict motion as well as his motion for a judgment notwithstanding the verdict. He contends that due to the lack of sufficiency of the evidence reversal is warranted.
¶ 15. A motion for a directed verdict, request for peremptory instruction, and motion for judgment notwithstanding the verdict all challenge the legal sufficiency of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993). "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court." Id. This occurred when the lower court denied the motion for JNOV. Wetz v. State, 503 So.2d 803, 807-8 (Miss.1987). "If there is sufficient evidence to support a verdict of guilty, this Court will not reverse." Meshell v. State, 506 So.2d 989, 990 (Miss.1987). See also Haymond v. State, 478 So.2d 297, 300 (Miss.1985); Fairley v. State, 467 So.2d 894, 902 (Miss. 1985). This Court should reverse only where, "with respect to one or more elements of the offense charged, the evidence so considered is such that reasonable and fair minded jurors could only find the accused not guilty." Alexander v. State, 759 So.2d 411, 421(¶ 23) (Miss.2000) (quoting Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995)). It is the jury's duty to resolve conflicts in testimony. Groseclose v. State, 440 So.2d 297, 300 (Miss.1983).
¶ 16. This issue has no merit.
¶ 17. In view of disposition of issues one and two we need not address the remaining issues in as much as we do not believe they will reoccur at trial.
¶ 18. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED AGAINST LEE COUNTY.
McMILLIN, C.J., KING, P.J., BRIDGES, LEE, MYERS AND CHANDLER, JJ., CONCUR.
SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., LEE AND CHANDLER, JJ.
IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION.
GRIFFIS, J., NOT PARTICIPATING.
SOUTHWICK, P.J., CONCURRING:
¶ 19. I agree with the majority that we must reverse because the trial judge denied the request for a poll of the jury. It is my desire to respond to some of the contrary views expressed by the insightful but I believe errant dissent. My basic difference with the dissent is that I find harmless error analysis inapplicable to the refusal to poll. To find this error harmless unless prejudice can be shown is to demand proof of what is inescapably hidden.
¶ 20. I start with an acknowledgment that polling the jury is not an essential part of the process due to a criminal defendant. This state's high court adopted the phrasing of the one important United *595 States Supreme Court decision in this area when it said that a jury poll is not a vital right:
A litigant, against whom a jury verdict has been rendered, has ordinarily a right to a poll of the jury, and a request therefor should be granted, if it is possible for the court to do so. James v. State, 55 Miss. 57, 30 Am. Rep. 496. It is not a right, however, which is vital, and in the vast majority of cases when exercised results in nothing favorable to the party demanding it. Nor is the polling of the jury a matter which affects the jurisdiction of the court, consequently if after a verdict has been received in the presence of all the jurors it becomes impossible for the jury to be polled, the court does not thereby lose the power to record and render judgment on the verdict. Humphries v. District of Columbia, 174 U.S. 190, 19 S.Ct. 637, 43 L.Ed. 944 [1899].
Archer v. State, 140 Miss. 597, 610, 105 So. 747, 748 (1925). Courts have concluded that the right does not have federal constitutional status. Jaca Hernandez v. Delgado, 375 F.2d 584, 585 (1st Cir.1967). Other courts have held that denial of a jury poll cannot be the basis for setting aside a judgment on post-conviction relief. Brooks v. Gladden, 226 Or. 191, 358 P.2d 1055, 1061 (1961). The right plainly is a peripheral one. Yet its denial must still be reversible error as I will discuss.
¶ 21. The earliest discovered reference to the right is in an English authority:
Now touching the giving up of their verdict, if the jury say they are agreed, the court may examine them by poll, and if in truth they are not agreed, they are fineable.
2 MATTHEW HALE, HISTORY OF THE PLEAS OF THE CROWN 299 (1st Am. Ed. 1847) (1672). The right to poll jurors has existed in Mississippi practice for over 150 years. After the verdict is read, "either party has a right to poll the jury, to ascertain if they all assent." Friar v. State, 4 (3 Howard) Miss. 422 (1839) (citing only a New York decision, Blackley v. Sheldon, 7 Johns. 32 (N.Y.Sup.Ct.1810)).
¶ 22. The right exists, even if is neither vital nor constitutionally mandated, because it is the only mechanism to determine whether one or more of the jurors does not agree with the verdict:
Examining the jury by the poll is the only recognized means of ascertaining whether they were unanimous in their decision, and the right to do this must exist. It is affirmed in criminal cases, and is equally applicable in civil cases. In no other way can the right of parties to the concurrence of the twelve jurors be so effectually secured as by entitling them to have each juror to answer the question, "Is this your verdict?" in the presence of the court and parties and counsel. By this means any juror who had been induced in the juryroom to yield assent to a verdict, against his conscientious convictions, may have opportunity to declare his dissent from the verdict as announced.
James v. State ex rel. Doss, 55 Miss. 57, 59 (1877).
¶ 23. The dissent suggests that absent a showing of prejudice, a defendant cannot gain reversal. Likely these jurors were in fact unanimous. Yet the poll is the only legitimate means to search for an absence of unanimity; to deny this procedure is to block the inquiry entirely. Once the jurors have been dismissed, they "are no longer jurors in the case but are mere witnesses, as to whom the rule is universal that jurors may not be heard as witnesses to impeach or qualify their verdicts." Bridges v. State, 154 Miss. 489, 493, 122 So. 533, 534 (1929). More recently, the Supreme Court has said that jurors are *596 "generally precluded from testifying to impeach their own verdict." Gatewood v. Sampson, 812 So.2d 212, 217 (Miss.2002). An exception is that jurors "may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Id., quoting M.R.E. 606(b). Specifically, "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict...." M.R.E. 606(b). Any evidence McLarty could have obtained after the verdict that one of the jurors may have felt coerced, or that the verdict for other reasons did not reflect that juror's decision, is inadmissible.
¶ 24. The refusal to poll after a request must be rare, since the precedents are few. One precedent in which a poll was conducted is discussed by both of the other opinions in this case. State v. Taylor, 544 So.2d 1387 (Miss.1989). The Taylor court dealt with a verdict of acquittal that was accepted and ordered filed. Only then did the State request a poll, which discovered a juror who disagreed. The jury was returned for further deliberations. In thirty minutes a verdict of guilt was returned. Id. at 1388. The Supreme Court reversed. The dissent here finds that Taylor was holding that when a request for a jury poll is made after the verdict is accepted and ordered filed, it comes too late. I find instead that Taylor does not address the right of a court to order a late poll. Instead, Taylor is about double jeopardy. The court found that if in its "original rendition, the verdict had been in proper form, had been responsive to the issues, had been received in open Court, and had been ordered filed," it was a violation of double jeopardy to set aside the verdict and order further deliberations. Taylor was not subject to a new trial after the reversal, but he was ordered discharged from further prosecution. Id. at 1389, citing State v. Chambliss, 142 Miss. 256, 107 So. 200 (1926) (initial verdict was acquittal, and it was double jeopardy to send jurors back for more deliberation).
¶ 25. The effects of error in criminal court procedures are often different for the prosecution than for the defense. None is more obvious than that a verdict of acquittal can neither be set aside by the trial judge nor appealed, no matter how many patent trial errors favoring the defense caused it. When the verdict is of guilt, though, the right of the judge to set it aside if a poll shows uncertainty is a facet of the clear right to order a new trial or a judgment notwithstanding the verdict. It may be that once a guilty verdict is recorded, the jury cannot return for further deliberations. See 2 HALE, PLEAS OF THE CROWN 300 (once the verdict is recorded, jurors "cannot retract nor alter it"). The only remedy would be granting a new trial, which is what we are now ordering.
¶ 26. I agree with the majority that finds the importance of Taylor to be the importance given to the right to have the jury polled. I found no precedent in which there was a refusal to poll and that was found to be harmless error.[1] What few Mississippi decisions there are concern procedural irregularities to the polling. For example, in one appeal the jury had *597 not been polled until after sentencing, but that was when the request was first made by the defendant. "This Court must presume the jurors answered truthfully when polled individually, even though they were aware at the time of the 25 year sentence imposed upon Edwards." Edwards v. State, 615 So.2d 590, 599 (Miss.1993). The defendant "received the benefit of the procedure promptly upon request by his counsel, [and] has failed to demonstrate any prejudice." Id. The issue of prejudice in my view applies to the unusual order in which the poll and sentencing were conducted. Edwards had the jury polled and demonstrated no prejudice in the manner that the poll was conducted.
¶ 27. Similarly, the Supreme Court found no reversible error when jurors were polled by asking them to raise their hands if they agreed with the verdict. Robert v. State, 821 So.2d 812, 818 (Miss. 2002). A specific inquiry, juror by juror, was not required. The court held that the purpose of a poll is "to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned," but nothing in Rule 3.10 of the Uniform Rules of Circuit and County Court sets a specific procedure for conducting the poll. Id.
¶ 28. In summary, I find no precedent holding that the denial of a properly exercised request for a jury poll may be found harmless. It is true that the timing of the request in this case is suspect. Yet I also find that the judge did not "inquire if either party desires to poll the jury," as Rule 3.10 mandates. Perhaps more occurred than appears on the cold record before us. A transcript does not reflect pregnant pauses, eye contact between judge and counsel, physical gestures of inquiry or invitation. In one of these or yet some other way, an opportunity to request a poll may have been given. Yet ruling on what is before us, as quoted by the dissent, I find that the judge did not inquire if counsel wished a poll. Instead, the judge accepted the verdict, thanked the jurors, and ordered the verdict filed. Only then did he recognize defense counsel, who was seeking an opportunity to speak. How long counsel had been trying to be recognized does not appear. Regardless, Rule 3.10 makes it improper after a guilty verdict to reject even a late request when no earlier invitation was given.
¶ 29. I find no waiver of the right to a poll based on these facts and no need to show prejudice. A jury poll is a right whose denial is not susceptible to a showing of prejudice. Not to reverse is to refuse to uphold the right. This would in effect eliminate that right. That decision is not for us.
McMILLIN, C.J., LEE AND CHANDLER, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
IRVING, J., DISSENTING:
¶ 30. The majority offers two reasons for reversing and remanding Rodney "Kipp" McLarty's aggravated assault conviction. The first reason is that the trial court failed and refused to poll the jury. The second reason is that the trial court improperly allowed an amendment to the indictment. In my judgment, neither the facts of this case nor the law of this state compels this result. Therefore, I respectfully dissent.
¶ 31. First, the failure or refusal of the trial court to poll the jury constitutes nothing more than a mere procedural technicality. Second, the amendment of the indictment is permissible because it is one of form rather than one of substance.
*598 ¶ 32. McLarty was convicted by a Lee County jury after an intense and emotional trial involving the merciless gang beating of Shawn McInnish by McLarty and others who are not involved in this appeal. After members of the jury signaled that they had reached a verdict, they were returned to the courtroom, and the following colloquy took place:
THE COURT: Members of the jury, have you arrived at a verdict?
THE FOREMAN: Yes, sir.
THE COURT: Mr. Foreman, did all 12 of your members vote to return this verdict?
THE FOREMAN: Yes, sir.
THE COURT: Would you hand the verdict to the bailiff, please, sir?
(The verdict was given to the bailiff, then to the court.)

* * * *
The verdict of the jury is: "We, the jury find the defendant guilty."
The court finds that the verdict is in the proper form. It will be received by the Court and entered in the record of the case.
Members of the jury, it's now the Court's duty and function to impose sentence upon the defendant upon your finding him guilty of the offense. The Court is not prepared at this time to render that sentence. As you were told during the course of this trial, there were other co-defendants in this matter whose cases have been disposed of by pleas of guilty. I have also deterred sentences in those cases in order for the Court to find out more about the persons involved and, also, to determine some other matters such as restitution to the victim in this case, the injuries and damages which the victim, Mr. McInnish, suffered resulting from this incident. And the Court is going to have a hearing to determine more of a complete measure of those damages as a result of those injuries before the Court decides on an appropriate sentence for the defendant here, Mr. McLarty, as well as the other defendants in this matter.
I want to thank you for your service as jurors this week. As I've told you on prior occasions, you've performed a valuable service for not only yourselves but your fellow citizens of Lee County. The court system, our jury system, could not function without you. I've said on occasion I think that service on a jury, particularly in a criminal case, is one of the greatest duties a private citizen can be called upon to do during peacetime. I, also, hope you found your experience educational and personally rewarding.
I'm now going to be able to release you at this time and finally discharge you for the week. One more time, I'm going to allow you to return to the jury room with the bailiff, where you will leave your juror buttons, pick up any of your personal items. I'm, also, going to allow you to leave the courthouse before I allow anyone else in the courtroom to leave.
Yes, sir, Mr. Parker?
MR. PARKER: Your Honor, before you dismiss the jury finally, we would request they be polled.
THE COURT: The Court has already accepted the verdict of the jury and entered in the record. Mr. Parker, that request will be denied.
All right. The jury may accompany the bailiff to the jury room. Thank you, again, for your service.
¶ 33. The majority correctly observes that McLarty's counsel was tardy in making the request that the jury be polled. The majority is correct also in its observation that the jury was still in the courtroom *599 when the request was made and that Rule 3.10 of the Uniform Rules of Circuit and County Court Practice is quite explicit in directing that after the verdict is read, the court "shall inquire if either party desires to poll the jury, or the court may on its own motion poll the jury." Clearly, the trial court could have, and perhaps should have, honored McLarty's counsel's request, but I do not agree that its failure to do so constitutes reversible error in the absence of either a showing or suggestion of prejudice emanating from the refusal to do so.
¶ 34. The majority does not cite any authority in support of the result it reaches other than Rule 3.10 of the Uniform Rules of Circuit and County Court Practice and State v. Taylor, 544 So.2d 1387, 1389 (Miss.1989), a pre-rules decision. In my judgment, neither of these authorities compels the result reached by the majority. First, the Uniform Rules of Circuit and County Court Practice do not speak to the consequences of refusing a defendant's request that the jury be polled or failing to do so on the court's own motion. Second, Taylor is more supportive of the position taken by the trial judge rather than the position taken by the majority.
¶ 35. In Taylor, this is what occurred:
On February 24, 1988, the case was called for trial on the merits of the issue. At the conclusion thereof and after deliberation, the jury returned into open Court a verdict of not guilty. The verdict thus rendered was ordered filed upon the minutes of the Court. Upon a poll of the jury thereafter requested by the State, the Court ascertained that one juror did not agree with the verdict. The Court then ordered the jury to retire and consider further. Some thirty minutes later, the jury returned into open Court a verdict that Taylor was guilty as charged.
Id. at 1388.
¶ 36. On appeal, our supreme court framed the issue as follows:
The dispositive question on appeal is whether the Circuit Court erred in polling the jury after it had ordered the verdict recorded by the clerk, and, when one juror disavowed the verdict, returning the jury for further deliberations.
Taylor, 544 So.2d at 1388.
¶ 37. The supreme court answered the question in the affirmative, holding that the trial judge erred in ordering the jury to resume deliberations after accepting the jury's not-guilty verdict and directing that it be filed. Id. The compelling and operative facts in Taylor, recited sequentially, are as follows:
1. The jury knocked, signifying a verdict had been reached;
2. The Court inquired if a verdict had been reached;
3. The jury signified that a verdict had been determined;
4. The Court received the verdict from the jury and ascertained that it was in correct form;
5. The Court announced the verdict;
6. The Court ordered the verdict filed;
7. The State requested a poll;
8. A juror declined to accept the verdict as his own;
9. The jury was ordered returned for further deliberations, which resulted in a finding of guilty.
Id. In reaching its decision, the supreme court determined that the trial judge's pronouncement that "the clerk will file the verdict" amounted to recording of the verdict. Id. at 1389.
*600 ¶ 38. In our case, the trial judge made the following pronouncement regarding the verdict: "It will be received by the Court and entered in the record of the case." In my opinion, this pronouncement is the equivalent of "the clerk will file the verdict." Consequently, I believe the facts here argue very forcibly in support of the trial judge's holding that McLarty's counsel's request that the jury be polled came too late. But even if the request was timely, I believe, as I have already observed, that in the absence of a showing or suggestion of prejudice, McLarty cannot prevail in this appeal. If in this case it had been alleged later that the verdict did not represent the verdict of all twelve jurors, we, theoretically, would have a different case. Even then, I believe the result would be the same because then we would be faced squarely with the question of the timeliness of the request for the polling, and on these facts, I believe McLarty's counsel's request came exactly at the juncture as did the prosecutor's in Taylor. If the request was too late in Taylor, I can think of no reason why it would not be too late here.
¶ 39. Nevertheless, there is no suggestion of prejudice here. I have examined the record and the briefs in this case, and I do not find any assertion by McLarty that the verdict as read in open court and affirmed by the foreman of the jury does not represent the verdict of all twelve jurors. McLarty does not make the claim that he was prejudiced by the trial judge's failure to follow the dictates of the rules.
¶ 40. The majority's holding is tantamount to a ruling that violation by a trial judge of a procedural rule always constitutes reversible error. That is simply not the law in this state. I can recount, but there is no need to do so, numerous cases where this Court, as well as the supreme court, has invoked the harmless error doctrine to affirm a defendant's conviction in the face of procedural errors which caused no prejudice to the defendant.
¶ 41. The concurring opinion struggles to elevate the procedural technicality to something more than a technicality but, acknowledging that the right to poll the jury is neither a vital nor constitutional right, fails to give an adequate rationale for concluding that this error by the trial judge must be treated more sacred than other errors which are routinely subjected to the harmless error analysis.
¶ 42. Also, the concurring opinion, while asserting that Taylor does not lend support for my view because it involves the issue of double jeopardy, nevertheless finds, as does the majority, that Taylor is persuasive authority for the proposition that it is reversible error for the trial court not to grant an admittedly tardy request that the jury be polled. I find that Taylor speaks little, if any, about the right to have the jury polled but speaks volumes regarding the consequences which flow from the court's acceptance of a verdict which has been announced as the unanimous verdict of the jury in open court by the jury's foreman, accepted by the court, and ordered filed prior to a request that the jury be polled. Both the majority and the concurring opinion miss this crucial focus.
¶ 43. Further, the concurring opinion attempts to circumscribe the implications of the Taylor holding by asserting that Taylor does not address the right of a court to order a late poll. I agree that Taylor does not address this issue directly, but it certainly does so by implication. Resort to the facts in Taylor compels this conclusion. In Taylor, the trial court ordered a late poll. The supreme court held that when that occurred, the verdict had already been announced, accepted and filed; therefore, the subsequent verdict, which was reached after the jury was sent *601 back for further deliberations following the late poll, could not stand. It seems to me that if ordering the late poll was legally permissible then the results of the jury's deliberations, occurring because of what the polled revealed, would have to be accepted. Yet, that acceptance was forbidden in Taylor.
¶ 44. In Taylor, the subsequent deliberations produced a verdict of guilty when the initial announcement had been a verdict of not guilty. Suppose instead of an initial announcement of not guilty, the announcement had been a verdict of guilty and the defense belatedly requested a poll which was granted and revealed a lack of unanimity in the jury's verdict. And suppose further that, upon the jury being ordered to deliberate further, the jury returned a not guilty verdict. Would not the State be in a position to argue under Taylor that the initial verdict had been accepted and filed before the poll was requested and that the subsequent verdict could not be accepted? And would not Taylor be squarely on point?
¶ 45. The rationale for the holding in Taylor cannot be predicated upon the nature of the second verdict returned. Rather, the rationale emanates from an analysis of what occurred factually prior to the request that the jury be polled. The pre-request facts dictated the legal consequences flowing from the post-request events.
¶ 46. The concurring opinion points out that its author was unable to find any precedents where a refusal to poll was found to be harmless error. In a footnote, the concurring opinion says "[n]o Mississippi case upholding the denial of a proper request for a poll was discovered, nor was one from another state." What the concurring opinion fails to keep in proper perspective is that in our case it is not clear at all that a proper request was made that the jury be polled. In fact, the trial judge specifically found that the request came too late. I find nothing arbitrary or capricious about this finding, nor do I find it without substantial factual support in the record. The concurring opinion insinuates, however, that defense counsel's request was late only because the trial court ignored counsel's attempt to be heard. Nothing in the record supports the assertion that counsel had sought to be heard prior to the verdict being accepted and ordered filed. Therefore, the question here is not whether the trial court denied a proper request that a poll be conducted but whether the trial judge, after failing to poll the jury himself as required by the rules, should have honored an untimely request by the defense that the jury be polled, and if so, did his failure to do so require that this case be reversed.
¶ 47. The concurring opinion answers in the affirmative the question posited in the preceding paragraph. In doing so, the concurring opinion attempts to limit the reach of the venerable harmless error doctrine by suggesting that, in cases where a request to poll the jury has been denied, the defendant can never show prejudice because the jury is not allowed to impeach its verdict. Thus, according to this line of reasoning, the courts should never utilize the harmless error analysis in these kind of cases because the defendant is placed at an inherent disadvantage in attempting to meet the traditional requirement of showing prejudice before an erroneous decision of the trial court will result in a reversal. The fact that the jury cannot impeach its verdict does not by any stretch of imagination or legal reasoning warrant the conclusion that prejudice must be presumed to have occurred simply because the jury was not polled. Such a holding would be ludicrous in light of the facts here where the foreman announced that the jury had *602 reached a verdict. It must be remembered that the jury was instructed that all twelve must agree on the verdict before it could be returned as the verdict of the jury. How prolific are the pronouncements in the decisional law of this state that a jury is presumed to have followed the instructions of the court!
¶ 48. While I also have found no Mississippi case directly on point with our issue, I do find the reasoning in at least one case from the State of New Mexico to be particularly helpful and persuasive. In Levine v. Gallup Sand & Gravel Co., 82 N.M. 703, 487 P.2d 131 (1971), the New Mexico Supreme Court reversed a decision of the court of appeals of that state which had ordered a new trial because the trial court had refused to poll the jury upon request. In reversing the court of appeals, the New Mexico Supreme Court said this:
We do not wish to be misunderstood as suggesting the right to have the jury polled is discretionary with the trial court, or that the trial court may properly consider whether prejudice will or will not result if the jury is not polled. As already stated, it is the duty of the trial court to poll the jury upon proper request. Our opinion is, however, that the mere failure to poll the jury upon proper request does not in itself constitute reversible error. Upon appeal from a refusal by the trial court of a proper request to poll a jury, we would apply the following standard ... in determining whether reversible error has been committed: we will accept the slightest evidence of prejudice, and all doubt will be resolved in favor of the party claiming prejudice.
Id. at 132. While Levine is a civil case, I believe its reasoning is nevertheless appropriate in the criminal context.
¶ 49. In another case, Schultz v. State, 290 N.W.2d 778 (Minn.1980), the Minnesota Supreme Court held, in a post-conviction appeal, that the trial court did not commit reversible error in not polling the jury, even though under Minnesota's rules of criminal procedure polling the jury following the return of the verdict is required. Minnesota's rule reads much like ours:
When a verdict is rendered and before the jury has been discharged, the jury shall be polled at the request of any party or upon the court's own motion. The poll shall be conducted by the court or clerk of court who shall ask each juror individually whether the verdict announced is his verdict.
Id. at 779. The facts in Schultz are dissimilar to ours in that the defendant's counsel, when given an opportunity to have the jury polled, declined to request that it be polled. But the significance of Schultz is that, notwithstanding the court's obligation to poll the jury, the Minnesota Supreme Court held that the trial court's failure to do so was not reversible error because the defendant's counsel waived or forfeited that right. In our case, the failure of McLarty's counsel to make a timely request that the jury be polled is tantamount to a waiver of that right.
¶ 50. I turn now to the second reason offered by the majority for reversing McLarty's conviction. As previously noted, the majority finds that the amendment to the indictment was one of substance rather than form. This is how the relevant part of the original indictment read:
RODNEY KIPP MCLARTY, JOHN M. ORMAN, JAMES BRIAN AUSTIN, AND BRENT R. SCRUGGS
did wilfully, unlawfully and feloniously commit an aggravated assault upon Shawn McInnish by attempting to cause and by causing, knowingly and purposely, serious bodily injury to Shawn McInnish, a human being, with numerous *603 deadly weapons, to wit: padlocks, chains, brass knuckles, baseball bat, and steel-toed boots, by hitting and kicking victim with their fists, feet and other unknown weapons causing serious bodily injury, thereby manifesting extreme indifference to the value of human life.
The relevant portion of the amended indictment reads:
RODNEY KIPP MCCLARTY, JOHN M. ORMAN, JAMES BRIAN AUSTIN, AND BRENT R. SCRUGGS
did wilfully, unlawfully and feloniously commit an aggravated assault upon Shawn McInnish, a human being, by attempting to cause and by causing, knowingly and purposely, serious bodily injury to Shawn McInnish, a human being, with a deadly weapon or other means likely to produce death or serious bodily harm thereby manifesting extreme indifference to the value of human life.
¶ 51. First, it should be noted that neither indictment cites to the aggravated assault statute, Mississippi Code Annotated section 97-3-7 (Rev.2000). Therefore, the majority's assertionthat the original indictment charged McLarty under Mississippi Code Annotated section 97-3-7(2)(b) and that the amended indictment changed the substance of the indictment by charging McLarty under 97-3-7(2)(a)is not supported by the record and apparently reflects the majority's construction of the wording in the two indictments. Even so, such a construction is not warranted.
¶ 52. Under Mississippi's aggravated assault statute, aggravated assault may be committed by attempting to cause or causing serious bodily injury to another purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life (subsection (a)) or by attempting to cause or purposely or knowingly causing bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm (subsection (b)). The crucial difference between the two subsections is that under subsection (a) there is no requirement that a deadly weapon be utilized although there must be either a serious injury or an attempt to cause a serious injury, but under subsection (b) a deadly weapon or other means likely to produce death or serious bodily harm must be used, even though the injury attempted to be caused or caused does not have to be serious. Clearly, a fairer reading of the indictments in this cause is that the original indictment, as well as the amended indictment, charge aggravated assault under subsection (b).
¶ 53. Both indictments charge that a deadly weapon was utilized in the consummation of the assault, although the first indictment alleged that more than one deadly weapon was used while the amended indictment alleged the use of a single deadly weapon. Both indictments conclude with the phrase "thereby manifesting extreme indifference to the value of human life." Both indictments also charge that, in addition to the deadly weapon, something else was utilized. In the original indictment, the "something else" is alleged to be "other unknown weapons" causing serious bodily injury. In the amended indictment, the "something else" is alleged to be "other means" likely to produce death or serious bodily harm.
¶ 54. The majority's reliance upon Quick v. State, 569 So.2d 1197 (Miss.1990) is misplaced. Our amendment is not a Quick amendment (no pun intended). In Quick, the original indictment charged that the defendant:
did willfully, unlawfully, feloniously, purposely and knowingly commit an aggravated assault upon on Gene Baker, a human being, with a deadly weapon, to *604 wit: a handgun, and did then and there wilfully, unlawfully, feloniously and knowingly cause bodily injury to the said Gene Baker, with the deadly weapon aforesaid, by then and there shooting and injuring the said Gene Baker with the said handgun ... in violation of § 97-3-7(2)(b)....
The indictment was amended to charge after the word "knowingly" the following:
intentionally or recklessly under circumstances manifesting extreme indifference to the value of human life contrary to § 97-3-7(2)(a) and (b) of Mississippi Code of 1972, as amended.
Id. at 1198.
¶ 55. The majority correctly cites the law of this state that an indictment may be amended without grand jury action if the amendment goes to form only and that an amendment is one of form rather than substance if the change does not materially alter facts which are the essence of the offense on the face of the original indictment, or if the change does not materially alter a defense to the original indictment so as to prejudice the defendant's case. In my judgment, the amended indictment here, by any reasonable interpretation, not only meets this test but passes it with flying colors.
¶ 56. For the reasons presented, I dissent. As already noted, I do not believe the conviction should be set aside on a mere technicality, and I find nothing improper in the allowance of the amended indictment. Therefore, I would affirm McLarty's conviction and sentence.
NOTES
[1] No Mississippi case upholding the denial of a proper request for a poll was discovered, nor was one from another state. See Annotation, Accused's Right to Poll of Jury, 49 A.L.R.2d 619 (1956). The dissent does cite a New Mexico case, an indication that his search was more searching than mine. The waiver of the right to a poll may be upheld, which I address below.